UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

RICKY LEE SIROIS,                    )
                                     )
        Plaintiff                    )
                                     )
v.                                   )   1:12-cv-00028-MJK
                                     )
AL CICHON,                           )
                                     )
        Defendant                    )

**MEMORANDUM OF DECISION**[1]

Ricky Sirois claims that Al Cichon, a physician's assistant at the Penobscot County Jail,

violated his constitutional rights because of his deliberate indifference to Sirois's serious medical

needs.  Sirois's asserted medical needs derived from his experience of dental pain, flu-like

symptoms, chronic back pain from spinal trauma and deterioration, and chronic headaches from

head trauma and injury.  Al Cichon has filed a motion for summary judgment (ECF No. 133).  I

now grant his motion.

**SUMMARY JUDGMENT STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  The court reviews the factual record in the light most favorable to the non-

moving party, resolving evidentiary conflicts and drawing reasonable inferences in his favor.

Hannon v. Beard, 645 F.3d 45, 47-48 (1st Cir. 2011).  If the Court's review of the record reveals

evidence sufficient to support a judgment in favor of the non-moving party on one or more of his

claims, then there is a trial-worthy controversy and summary judgment must be denied to the

---

[1]     Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge Margaret
J. Kravchuk conduct all proceedings in this case, including trial, and to order entry of judgment.

extent there are supported claims.  Unsupported claims are properly dismissed.  Celotex Corp. v.

Catrett, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment

rule is to isolate and dispose of factually unsupported claims or defenses.").

STATEMENT OF MATERIAL FACTS

Ricky Lee Sirois was arrested and held as a pretrial detainee at the Kennebec County

Correctional Facility on December 9, 2011.  On the evening of December 12, 2011, he was

transferred from the Kennebec County Correctional Facility to the Penobscot County Jail.  Sirois

was held as a pretrial detainee at the Penobscot County Jail until late March 2012, at which time

he was transferred to the Cumberland County Jail pending trial.  Sirois ultimately pled guilty to

the charge of "conspiracy to distribute and possess with intent to distribute a mixture or

substance containing Oxycodone" in violation of 21 U.S.C. §§ 846 and 841(a)(1).

The Penobscot County Jail had a nursing staff which was present at the jail each day to

attend to the daily needs of the inmate patients, including medication administration.  Sirois told

the nursing staff that he was not receiving all of the medications that were prescribed to him

prior to his incarceration.  He advised the nursing staff that he had obtained medications from at

least three different pharmacies, including Hannaford, Community Pharmacy, and Walgreens.

As part of the overall intake procedure, the nursing staff reviews the intake paperwork and

contacts any pharmacies identified by the patient to get more information regarding the

individual's medication history.  Prior to his incarceration, Sirois had been given prescriptions

for oxycodone and other narcotic medications to treat his chronic back pain and headaches,

including a November 12, 2011, prescription for Oxycodone 30 mg, six times per day, and a

June 2011 prescription for Ritalin 20 mg.  Records showed Sirois filled prescriptions for

oxycodone for about a two-year period prior to incarceration.  Prior to incarceration Sirois last

2

saw his treating physician on December 7, 2011 (two days before his arrest), at which time the physician renewed his prescriptions for oxycodone Hel 30 mg, 6 times daily, and Fenanyl 50 mcg/hr.  During the first weeks of his stay at the Penobscot County Jail, Sirois submitted inmate medical requests on December 15, 2011, December 22, 2011, December 28, 2011, December 31, 2011, and January 1, 2012.  He complained about not receiving his prescribed medications and he complained of severe back pain and headaches.

As a physician assistant, Alfred B. Cichon was the individual primarily responsible for providing healthcare services to patients incarcerated at the Penobscot County Jail, including Ricky Sirois.  Cichon was contractually scheduled to work at the jail one day a week but went in occasionally in the case of an emergency and sometimes to attend to paperwork prior to his day "on duty."  On December 13, 2011, the nursing staff contacted Cichon by telephone to advise him about the information contained in the medical records provided to the Penobscot County Jail medical staff by the Kennebec County Correctional Facility.  The information was that Sirois was prescribed Cymbalta, Propranolol, Flovent and ProAir at the time of his transfer.[2]  The nursing staff also advised Cichon of the pending drug trafficking charges against Sirois and of the fact that Sirois had filled an Oxycontin prescription at Hannaford on November 13, 2011.  Cichon is typically informed about the nature of the charges because substance abuse is an ongoing problem in the jail setting, including the potential that an inmate can experience withdrawal symptoms upon incarceration.

---

[2]   Sirois interjects a series of hearsay objections to this and other statements relating to information that Cichon alleges was told to him by others.  I have credited these statements as Cichon's version of what he was told, but not for the truth of the matter asserted.  In other words, the fact that Cichon says nursing staff told him this information does not establish that these medications were prescribed at the Kennebec County Jail.  I have disregarded many of these hearsay statements about what Dr. Fein may have said or what unidentified pharmacists in the community may have offered about their opinions of Sirois's misuse of narcotic prescriptions.  A simple affidavit from Dr. Fein could have established this fact, if Dr. Fein really did advise Cichon that there was nothing wrong with prescribing nonnarcotic pain killers to Sirois.  Suffice it to say that Cichon says that based on what he was told it was his opinion that Sirois had a history of drug abuse and should not be prescribed narcotics.

On December 13, 2011, Cichon ordered the reinstatement of the medications that he understood Sirois had been taking at the Kennebec County Jail and he told the nursing staff to watch for signs of opiate withdrawal because Cichon was aware that Sirois was previously prescribed opiate medications.  On December 15, 2011, Cichon reviewed the various pharmacy records obtained by the nursing staff and considered those records in making his decision about the medications Sirois should receive.  Cichon believed that since the Kennebec County Jail had not prescribed opiates that Sirois had not had any narcotics for at least four days prior to entering Penobscot County Jail.  Sirois qualifies this statement by noting that on December 13, 2011, he was wearing a Fentanyl patch, a timed-release narcotic.

As a physician's assistant Cichon has authority to prescribe certain medications, but not Schedule I or II substances without a physician's oversight.  While Oxycontin is beyond his sole authority, he can prescribe Oxycodone without seeking a physician's approval.  On December 15, 2011, Cichon claims he called Dr. Fein, one of Sirois's treating physicians in the community prior to incarceration.  Cichon told Dr. Fein his own views regarding continuing the use of Oxycodone in a correctional setting and sought Dr. Fein's input on his decision to discontinue the use of narcotic substances.

Sirois did not have his initial medical face-to-face screening physical with Cichon until December 23, 2011, following almost two weeks of incarceration.  During that meeting, Sirois complained about flu-like symptoms, headaches, vomiting, diarrhea, cold sweats, no appetite, back problems, limited range of motion, and not receiving his previously prescribed medications.  Cichon denies that Sirois complained about anything except his back pain and failure to receive the medications previously described, but Cichon did admit in his deposition that many of the symptoms Sirois said he described, such as vomiting and diarrhea, are consistent with opiate

4

withdrawal.  (Cichon Dep. at 16.)  Cichon says that other than the fact that Sirois appeared somewhat stiff when moving, there were no obvious signs of pain or severe discomfort.  Sirois describes himself as walking slowly, grimacing, and clutching his gut.  At the time of this examination Sirois was receiving Cymbalta, Propranolol, Flovent, and ProAir for medications.  Sirois and Cichon dispute whether Sirois was offered a non-steroidal anti-inflammatory.  Cichon says Sirois declined the drug, Sirois says he never refused medications until he had tried them and determined whether or not they were effective for him.  Cichon acknowledged that the medical records supported the conclusion that Sirois suffered from bilateral stenosis, a narrowing of the spine that could cause nerve irritation.  Cichon says that in his opinion this condition was chronic, not acute, and could best be treated with a non-steroidal anti-inflammatory drug.

Cichon met with Sirois again on January 5, 2012, to address Sirois's displeasure with Cichon's decisions regarding Sirois's medications.  On January 27, 2012, Cichon had another visit with Sirois.  This visit related to Sirois's chronic pain and also a chronic headache that Sirois claimed arose in the area near scars on his head.  Cichon reviewed medical records indicating that Sirois had a history of chronic headaches, had previously obtained CT scans of his head, and believed that his chronic headaches could be attributed to the multiple head injuries that caused the scarring on his scalp.  Sirois had a significant history of head and back trauma, including having been hit in the head with a tire iron, having been in an automobile accident, and falling off roofs.  Medical records reflected a history of at least one skull fracture.  Cichon reached a diagnosis of post-traumatic neuropathic headaches.  Sirois could not remember the name of the medication he had previously taken for his headaches.  Based upon Sirois's description of the medication and a nurse's research of pharmacy records, Cichon came to believe that in 2011 Sirois was prescribed Fiorinal for his headaches, but Cichon did not believe

that drug was appropriate for post-traumatic neuropathic headaches.  Cichon recommended a

trial of Neurontin to treat his headaches.  He claims that Sirois did not use the Neurontin to test

the effectiveness, but Sirois denies that he ever refused to try any medication.  Cichon did not

consult with Dr. Seasholtz, Sirois's treating neurologist who knew that Sirois took Oxycodone

for the persistent headaches.  Nor did Cichon seek from his own supervising physician a clinical

review of his decision regarding diagnosis or treatment.

On February 17, 2012, Sirois and Cichon again met at the jail, this time concerning

complaints of arm and leg pain.  According to Cichon, he re-reviewed the medical records and

advised Sirois that he did not believe narcotic medications were an appropriate medical treatment

for him.  Cichon says Sirois indicated he would not accept any other treatment options.  Sirois

again denies that he refused any medications, maintaining that he was willing to try anything to

help with the chronic pain and headaches.  (Sirois Aff. ¶ 31.)  Cichon continued to offer

Neurontin, Celebrex, and Ultram to Sirois.  Sirois maintains he tried these medications as

prescribed and they did not help him.  Cichon says he consulted again in February with Dr. Fein,

Sirois's pre-incarceration treating physician, to discuss other treatment options.  As a result,

Cichon did not change his treatment plan for Sirois.  According to Cichon, Sirois requested

specific narcotic medications, such as Oxycodone, at every meeting.  According to Sirois, he

simply asked for any medication that would relieve his constant pain.  This February 17, 2013,

visit was the last time Sirois and Cichon met.  Cichon claims all of his decisions regarding

treatment options for Sirois were based upon his education, training, his clinical evaluation of

Sirois, Sirois's medical records and history, and his complaints.

The question of whether or not Sirois experienced the symptoms of opiate withdrawal

while at the jail is disputed.  Both Carmen Mulhollad, a nurse who treated Sirois at the jail, and

Cichon agree that the symptoms of opiate withdrawal include gooseflesh, runny nose, yawning, aches, pains, restless legs, nausea, vomiting, and diarrhea.  Mulholland maintains she never observed these symptoms exhibited by Sirois.  Cichon confirms basically the same symptoms as indicative of opiate withdrawal and likewise denies that he ever observed such symptoms exhibited by Sirois.  Cichon also maintains that Sirois never reported such symptoms directly to him.  Sirois claims that he reported not only migraine headaches, but also nausea and vomiting to both providers.

It is undisputed that as of January 2 Sirois made a written request of medical, noting that he had a headache, could not keep his meals down, was profusely vomiting, and had diarrhea.  In the medical request Sirois described his condition as "the flu."  Defendants maintain this complaint was Sirois's first complaint regarding these symptoms.  Sirois maintains that he complained of these symptoms from December 13, 2011, through January 2, 2012.  Mulholland evaluated Sirois in response to the written request and determined that his vital signs were normal.  According to Mulholland, the correctional officers also reported that while Sirois was on the cell block he did not appear to be in apparent distress.  Mulholland also indicated that based upon her experience she would have expected any signs of opiate withdrawal to have commenced within 72 hours of incarceration.  Sirois had been at the Penobscot County Jail for two weeks when these flu-like symptoms were reported, she says.  Mulholland spoke with Cichon at this time about Sirois's complaints and her observations.  Cichon directed that Sirois be moved to the holding cell area for observation and that he be placed on a liquid diet for 72 hours.  This treatment was standard protocol at the jail.  When flu-like symptoms are reported the jail medical staff wants to isolate the inmate to prevent the flu from spreading rapidly through the jail population and to increase their observation of the inmate to insure he is receiving proper

7

medical care.  Sirois agrees with the standard protocol statements, but notes that neither

Mulholland nor Cichon actually thought Sirois had the flu.  The record evidence supports an

inference that Mulholland, at least, did not believe that Sirois really had the flu.  (Mulholland

Dep. 58:14-60:17.)  According to Mulholland, after approximately 48 hours Sirois was moved

back upstairs when he reported that he was feeling much better and that he simply wanted his

medications.  (Id. at 65:17-66:23.)

Sirois believes he was placed in the holding area on Cichon's direct order as a punitive

measure because he had been adversarial with Cichon regarding treatment options.   Cichon

never prescribed any treatment for opiate withdrawal for Sirois and he agreed that his

relationship with Sirois was adversarial. (Cichon Dep. at 154:16.)  Sirois maintains in a

statement of fact that he had previously sued Cichon, but I was unable to find record support for

that fact and no citation was provided by either party.

At the previously described clinic visit of February 17, 2012, Sirois complained for the

first time about dental pain, emanating from the site of an old extraction.  Cichon examined

Sirois's mouth and observed a fragment from an old extraction that he felt would work itself out

in time.  Cichon recommended saline rinses and a simple analgesic.  At Sirois's request Cichon

made a referral for him to see a dentist.  In accordance with the jail's protocols the dental office

scheduled a visit and Sirois was transported for a dental evaluation on March 5, 2012.  There is

no record evidence supporting a serious medical need in conjunction with the dental complaint.

## DISCUSSION

"A state and its subdivisions are under a substantive obligation imposed by the Due

Process Clause of the Fourteenth Amendment to refrain at least from treating a pretrial detainee

with deliberate indifference to a substantial risk of serious harm to health," Coscia v. Town of

Pembroke, 659 F.3d 37, 39 (1st Cir. 2011), or with "deliberate indifference to serious medical needs," Feeney v. Corr. Med. Servs., 464 F.3d 158, 161 (1st Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 105-106 (1976)).  It has been said that deliberate indifference requires "the complainant [to] prove that the defendants had a culpable state of mind and intended wantonly to inflict pain . . . or actual knowledge [or wilful blindness] of impending harm, easily preventable." DeRosiers v. Moran, 949 F.2d 15, 19 (1st Cir. 1991) (citations omitted).  It has also been said that the concept of deliberate indifference is akin to criminal recklessness, "requiring actual knowledge of impending harm, easily preventable," Feeney, 464 F.3d at 162 (quoting Watson v. Caton, 984 F.2d 537, 540 (1st Cir. 1993)).  More recently, however, the Court of Appeals has described the deliberate indifference standard, when it comes to pretrial detainees, as requiring "a showing of greater culpability than negligence but less than a purpose to do harm." Coscia, 659 F.3d at 39 (Souter, J.).  The focus of this inquiry "is on what the jailers knew and what they did in response." Burrell v. Hampshire Cnty., 307 F.3d 1, 8 (1st Cir. 2002).

A trial-worthy claim requires that the plaintiff "satisfy both a subjective and objective inquiry." Leavitt v. Corr. Med. Servs., 645 F.3d 484, 497 (1st Cir. 2011). The subjective inquiry calls for evidence that a defendant possessed a culpable state of mind amounting to "deliberate indifference to an inmate's health or safety." Farmer v. Brennan, 511 U.S. 825, 834 (1994) (internal quotation marks omitted).  The objective inquiry concerns the harm or need in question, which must involve "a sufficiently substantial 'risk of serious damage to [the inmate's] future health.'" Id. at 843 (quoting Helling v. McKinney, 509 U.S. 25, 35 (1993)).  See also Burrell, 307 F.3d at 8 ("[T]he deprivation alleged must be, objectively, sufficiently serious.").  A medical need is "serious" if it has been diagnosed by a physician as mandating treatment, or is so obvious that even a lay person would recognize a need for medical intervention.  Leavitt, 645 F.3d at 497;

9

Gaudreault v. Mun. of Salem, 923 F.2d 203, 208 (1st Cir. 1990), cert. denied, 500 U.S. 956 (1991)).  The subjective and objective inquiries generally overlap and depend on similar evidence.  Leavitt, 645 F.3d at 498.

In Estelle v. Gamble, the Supreme Court reviewed precedent establishing that the Eighth Amendment prohibition against cruel and unusual punishment "proscribes more than physically barbarous punishments" and "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.'"  429 U.S. at 103 (quoting Jackson v. Bishop, 404 F.2d 571, 579 (8th Cir. 1968)).  According to the Court: "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." Id.  Because inmates are dependent on prison authorities in relation to medical care, their needs cannot be met unless some duty of care is imposed on those in the position to tend to their needs. Even in "less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose."  Id.  Toleration of "unnecessary suffering is inconsistent with contemporary standards of decency."  Id.  See also Helling v. McKinney, 509 U.S. 25, 32 (1993) ("'[D]eliberate indifference to serious medical needs of prisoners' violates the Amendment because it constitutes the unnecessary and wanton infliction of pain contrary to contemporary standards of decency.") (quoting Estelle, 429 U.S. at 104).

**A.      Dental Pain**

Sirois's complaints regarding dental care is not supported by any evidence that would suggest that there was an objectively serious medical need that was left unresolved.  Additionally, undisputed facts indicate that Sirois was referred to a dentist for examination.  The facts surrounding the dental concern do not reasonably support a finding of deliberate indifference toward a serious medical need by Cichon.

10

**B.      Flu**

When Sirois reported flu, he was moved to an isolated cell and provided a liquid diet.

Flu-like symptoms were not observed and Sirois himself requested a return to general population,

which was granted within 48 hours, during which time Sirois was served a liquid diet.  Certainly

a lay person would not recognize the need for medical intervention regarding a flu complaint and

there is no medical evidence in the record to suggest that some special treatment was required for

Sirois because he suffered from flu symptoms.  Cichon's instruction to place Sirois in the

holding cell and to provide a liquid diet does not reasonably support a freestanding claim for

deliberate indifference to a serious medical need.  Allen v. Ferrel, No. 11-cv-01424-CMA-MJW,

2013 U.S. Dist. Lexis 41286, at *29-30, 2013 WL 1222127, at *9 (D. Colo. Feb. 13, 2013) (Mag.

J. Rec. Dec.) (collecting cases concluding that flu is not a serious medical need), adopted 2013

U.S. Dist. Lexis 41285 (Mar. 25, 2013).

**C.      Opiate Withdrawal**

Opiate withdrawal symptoms can rise to the level of an objectively serious medical need.

See, e.g., Ramos v. Patnaude, 640 F.3d 485, 487, 489 (1st Cir. 2011) (describing life-threatening

symptoms experienced by one heroin addict during a managed withdrawal).  However, Sirois

appears to assert that every inmate cut off from a pre-incarceration opiate prescription will

necessarily present a serious medical need for withdrawal treatment.  Sirois does not have expert

medical evidence to support this assertion and evidence introduced in other inmate cases

suggests otherwise.  See, e.g., Bruederle v. Louisville Metro Gov't, 687 F.3d 771, 773-774 (6th

Cir. 2012) (citing Fed. Bureau of Prisons, *Clinical Practice Guidelines: Detoxification of*

*Chemically Dependent Inmates*, at 4 (2000), which states that "[t]he intensity of withdrawal

cannot always be predicted accurately" due to "many factors including the physiology,

11

psychology and neurochemistry of the individual using the substance"). The symptoms Sirois describes were consistent with a prolonged case of the flu. His own description of his repeated complaints about "withdrawal" type symptoms, which I accept as true at this juncture, simply does not rise to the level of a serious medical condition. Jail officials have been found not deliberately indifferent when they have chosen a course of detoxification treatment that subjects an inmate to symptoms more severe than those experienced by Sirois. See, e.g., French v. Daviess Cnty., 376 Fed. App'x 519, 522 (6th Cir. 2010) (unpublished). On this record, I find it difficult to conclude that Sirois has established the existence of a serious medical need for the continuation of his narcotic medication or for the administration of a detoxification protocol to prevent any and all withdrawal symptoms. It would not be obvious to a layperson that Sirois's medical conditions could only be managed by narcotic pain relievers and that non-narcotic pain relievers could not be trialed to address Sirois's underlying conditions. Nor would it be obvious to a layperson that a detoxification protocol would have spared Sirois prolonged flu-like symptoms or, stated otherwise, that such symptoms were easily preventable if his Oxycodone prescription were discontinued. Thus, even though it was anticipated by Cichon that Sirois could experience some withdrawal symptoms, and even though a jury might find that Cichon was aware of Sirois's complaints of flu-like symptoms very shortly after Sirois's introduction to the PJC facility, the jury could not reasonably conclude on this record that Cichon was deliberately indifferent to a serious medical need related to narcotic withdrawal symptoms.

## D.     Back and Head Pain

Sirois's complaint regarding Cichon's failure to provide him with an appropriate medication for his back and headache pain requires a different analysis. The record evidence supports a finding that Sirois had been diagnosed with a serious medical condition in regard to

both his back and his prior traumatic head injuries.  The objective component of the deliberate

indifference inquiry has been met.  However, this is not a case where the defendant ignored the

plaintiff's complaint and denied him all treatment.  This case is one where the medical provider

prescribed a course of treatment that did not satisfy Sirois.  "Where a prisoner has received some

medical attention and the dispute is over the adequacy of the treatment, federal courts are

generally reluctant to second guess medical judgments and to constitutionalize claims that sound

in state tort law."  Graham v. County of Washtenaw, 358 F.3d 377, 385 (6th Cir. 2004).  Sirois

makes much of the fact that Cichon, as a physician's assistant, should have consulted with

Sirois's previous physician providers and with the jail's consulting physician before attempting

to manage Sirois's underlying pain symptoms with non-narcotic drugs.  Cichon's failure to

consult with physicians may have meant his choice of treatment options fell below the proper

medical standard of care.  However, it is Sirois's burden to establish that Cichon's conduct was

deliberately indifferent to a serious medical need.  On this record there is no expert assessment

stating that Cichon's prescribed treatment was negligent, let alone grossly negligent, and it

cannot be said that the inadequacy of the chosen medications would be obvious to laypersons

serving on the jury.  There is no evidence, either in the form of a medical opinion or conclusory

opinion by plaintiff, that Sirois's condition worsened or deteriorated because of the course of

treatment chosen by Cichon.  While deliberately exposing Sirois to pain and suffering that could

readily have been remediated with a different prescription drug could rise to the level of

deliberate indifference, on this record there is no evidence that the risks perceived by Cichon

regarding narcotics in the jail were not genuine and there is no medical evidence that the course

of treatment he prescribed was not an appropriate substitute.   In the final analysis the case is a

dispute between Cichon and Sirois over the appropriate prescription and those types of disputes

do not rise to the level of constitutional violations.

Cichon's motion for summary judgment is granted.


*So Ordered.*

November 7, 2013                           /s/ Margaret J. Kravchuk
                                          U.S. Magistrate Judge